UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2014 JUL 29  PM 4:21



BY_____
DEPUTY CLERK

UNITED STATES OF AMERICA )
)
v. ) Case No. 5:13-cr-152
)
ERIK DOWNS )

## OPINION AND ORDER DENYING
## DEFENDANT'S MOTION TO SUPPRESS STATEMENTS
(Doc. 18)

This matter came before the court on June 5, 2014 for an evidentiary hearing on Defendant Erik Downs's motion to suppress statements. (Doc. 18.) The parties completed post-hearing briefing on June 19, 2014, at which point the court took the matter under advisement.

Defendant is charged in a two-count indictment with distribution of 28 grams or more of cocaine base, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B), and knowing possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). Defendant contends that law enforcement interrogated him on November 5, 2013 at a Vermont State Police ("VSP") barracks in violation of his *Miranda* rights. The government opposes the motion.

The government is represented by Assistant United States Attorney Michael P. Drescher. Defendant is represented by Assistant Federal Public Defender Steven L. Barth.

## I.    Findings of Fact.

On November 5, 2013, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the Federal Bureau of Investigation ("FBI"), and the Winooski Police Department coordinated a controlled buy from Defendant during which Defendant allegedly gave an undercover officer cocaine base in exchange for approximately $4,000 in U.S. currency and an operable firearm. ATF Special Agent Scott Murray assisted in

the operation and observed Defendant's vehicle pull into a parking lot off of Shelburne Road in Burlington, Vermont. An undercover police officer entered Defendant's vehicle to complete the controlled buy. After the undercover officer exited Defendant's vehicle, other agents approached to arrest Defendant. Defendant drove off as law enforcement officers yelled at him to stop and hit his departing vehicle with their hands to get his attention.

As Defendant fled the area, Special Agent Murray relayed over the radio that Defendant had evaded law enforcement and possessed the firearm and currency. He also requested the VSP to issue a "be on the lookout" for Defendant's vehicle traveling southbound towards Massachusetts on Interstates 89, 91, or Route 7. This route of travel reflected Defendant's probable destination to his residence in Massachusetts. Special Agent Murray travelled to the intersection of I-89 and I-91 to watch for Defendant's vehicle. He contacted ATF Resident Agent in Charge ("RAC") James Mostyn and requested that he station himself on Route 7 near Rutland, Vermont for the same purpose.

Several hours later, a VSP trooper located Defendant traveling southbound on Interstate 91, conducted a traffic stop, took Defendant into custody, and transported him to the VSP barracks in Rockingham, Vermont. Special Agent Murray was alerted to this development and traveled to the location of the stop where he searched Defendant's vehicle for the firearm and currency exchanged in the controlled buy. When this search proved unfruitful, Special Agent Murray traveled to the Rockingham barracks to interview Defendant. Upon his arrival at the barracks, Special Agent Murray was led into a small conference room where Defendant was seated in a chair to which he was handcuffed.

Special Agent Murray read Defendant his *Miranda* rights verbatim from an Advice of Rights and Waiver form. Defendant replied that he understood his rights and was willing to talk, but his handcuffs prevented him from signing the waiver form. Special Agent Murray exited the conference room and asked a VSP trooper to adjust Defendant's handcuffs. In the course of doing so, Special Agent Murray encountered RAC Mostyn, who had travelled to the VSP Rockingham Barracks after learning of

2

Defendant's arrest. Special Agent Murray summarized the status of the investigation for RAC Mostyn, and the two agents returned to the conference room together and attempted to interview Defendant. A VSP trooper adjusted Defendant's handcuffs in a manner which would have allowed Defendant to sign the waiver form if he chose to do so. Special Agent Murray summarized Defendant's *Miranda* rights and asked him to sign the *Miranda* waiver form. Defendant asked whether he had to sign the form to which Special Agent Murray responded that signing the form was unnecessary, but that he had to advise Defendant of his *Miranda* rights and make sure that Defendant understood them. Defendant responded that he would speak with the agents but stated: "I don't want to sign anything." (Tr. 6/5/14 at 13:25-14:1.) At approximately 9:28 p.m., Special Agent Murray wrote on the *Miranda* waiver form: "REFUSED SIGNATURE / BUT AGREED TO SPEAK. SM." (Gov. Ex. 1.) Special Agent Murray explained to Defendant that he should not lie, and that if he did not want to discuss a particular subject he should say "I don't want to talk about that," rather than making a false statement. (Tr. 6/5/14 at 16:3-4.)

Special Agent Murray asked Defendant whether he was attempting to run over the agents when he fled the scene of the controlled buy earlier that day. Defendant replied that he had panicked and was not trying to hit or harm anyone. Defendant declined to speak about the events leading up to the controlled buy, or the details of the controlled buy itself, but was willing to discuss what occurred thereafter. When asked where the firearm was located, Defendant stated that he threw it out of his vehicle's window and also threw out the $4,000 as he traveled south on Route 7 somewhere near Shelburne, Vermont. Defendant explained that he traveled south on Route 7, took an unknown road east to the interstate, and was then intercepted by law enforcement. He advised that he made no stops in the interim. During the course of the interview, Defendant admitted that he had two prior drug distribution convictions in Massachusetts and that he had continued to sell illegal drugs in order to make money because he had a failing gift shop in Massachusetts.

3

Of primary importance to the agents was the recovery of the firearm, and they questioned Defendant about this in some detail, showing him a map of the area in an effort to locate where it might have been discarded. RAC Mostyn confronted Defendant with certain inconsistencies in his version of events, including Defendant's path of travel and timeline, which he found implausible in light of the distance travelled and the time that had elapsed. He also expressed disbelief that Defendant had abandoned the cash. After the agents pressed Defendant for further details regarding the whereabouts of the firearm and money, Defendant stated that he did not want to talk anymore and asked for a lawyer. Prior to this point, Defendant "was talking freely" with the agents and did not give "any indication" that he "no longer wished to be interviewed." (Tr. 6/5/14 at 37:16-20.) In response to Defendant's request, the agents ceased the interview. The interview in the conference room lasted approximately twenty-five to thirty minutes.

RAC Mostyn left the Rockingham barracks and joined law enforcement efforts to recover the firearm. Special Agent Murray remained at the barracks, periodically checking in on Defendant. Defendant asked Special Agent Murray about certain items located in his rental vehicle, including his cell phone, and asked the agent to ensure that the items would be returned to him rather than left in the vehicle when it was sent back to the rental agency.

## II.   Conclusions of Law and Analysis.

Defendant moves to suppress his statements, arguing that the government has not satisfied its burden to prove that Defendant knowingly and voluntarily waived his *Miranda* rights. Defendant argues that suppression is warranted on the further ground that he invoked his right to remain silent and was nonetheless subjected to custodial interrogation thereafter. The government opposes suppression, contending that Defendant knowingly and voluntarily waived his *Miranda* rights and that his refusal to sign the *Miranda* waiver form was not an unequivocal assertion of the right to remain silent.

### A.    Whether Defendant Waived his *Miranda* Rights.

"The [g]overnment bears the burden of proving by a preponderance of evidence that a valid waiver occurred." *United States v. Murphy*, 703 F.3d 182, 192 (2d Cir. 2012). To sustain its burden, the government must show (1) "that the relinquishment of the right was voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and (2) "that it was made with the requisite level of comprehension, *i.e.*, a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Medunjanin*, 752 F.3d 576, 586 (2d Cir. 2014) (internal quotation marks omitted). The "inquiry into the knowing and voluntariness of a waiver is 'directed to a defendant's state of mind, which can be inferred from his actions and statements.'" *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 177, 211 (2d Cir. 2008) (quoting *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993)). A court must consider the totality of circumstances, "including the background, experience, and conduct of the accused," to determine whether a defendant's waiver was voluntary. *North Carolina v. Butler*, 441 U.S. 369, 374-75 (1979) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

In *Berghuis v. Thompkins*, 560 U.S. 370 (2010), the Supreme Court held that law enforcement is not required to obtain an affirmative oral or written waiver of *Miranda* rights before questioning a suspect, noting that the "*Butler* Court held that courts can infer a waiver of *Miranda* rights 'from the actions and words of the person interrogated.'" *Id.* at 387 (quoting *Butler*, 441 U.S. at 373). "Thus, after giving a *Miranda* warning, police may interrogate a suspect who has neither invoked nor waived his or her *Miranda* rights," *id.* at 388, because, "[w]here the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Id.* at 384. The corollary to this rule is that a "defendant's refusal to sign a waiver form is not dispositive of the [validity of the waiver]." *United States v. Spencer*, 955 F.2d 814, 819 (2d Cir. 1992); *see also United States v. Boston*, 508 F.2d 1171, 1175 (2d Cir. 1974) (holding "a written waiver is not required," although "refusal to execute a written waiver may be taken as an

indication that no waiver was intended or freely given"). For this reason, in *United States v. Plugh*, 648 F.3d 118 (2d Cir. 2011), the Second Circuit held that notwithstanding the defendant's initial refusal to sign a written *Miranda* waiver form, "both expressly and through a course of conduct indicating waiver" he validly waived his *Miranda* rights. *Id.* at 127 (internal quotation marks omitted). The *Plugh* court reasoned that, "consistent with *Berghuis*," the defendant impliedly waived his *Miranda* rights "when he chose to begin speaking with custodial agents" with "a full understanding of his rights." *Id.* at 128 (internal quotation marks and alterations omitted); *see also United States v. Newton*, 2012 WL 170008, at *2, 4-6 (D. Vt. Jan. 19, 2012) (holding valid *Miranda* waiver where defendant agreed to speak and answered questions "without apparent hesitation" but refused to sign a waiver form, stating: "I understand my rights, I mean, I'm not signing no papers").

Defendant seeks to distinguish *Berghuis*, *Plugh*, and *Newton* by pointing out that he not only declined to sign the waiver form, but also declined to answer certain questions regarding the controlled buy and thus he did not speak freely with the agents or do so without hesitation. He contends that this combination of factors calls into question any implied *Miranda* waiver because it indicates that he "either did not understand his rights or that [his] will was overborn[e] by the continued questioning." (Doc. 26 at 7.) The evidence is to the contrary. Defendant declined to answer questions regarding the controlled buy only after he confirmed that he understood his rights and agreed to speak to the agents. His refusal to execute a written waiver is thus not dispositive. *See Davie v. Mitchell*, 547 F.3d 297, 306 (6th Cir. 2008) (finding knowing and voluntary waiver of *Miranda* rights "where the defendant had refused to sign a waiver form but freely spoke to police after being advised of his *Miranda* rights"); *United States v. Willis*, 2006 WL 2239738, at *6 (W.D.N.Y. Aug. 4, 2006) ("Indeed, the fact that [defendant] refused to sign the *Miranda* waiver form when requested by [the officer] is persuasive evidence that the interrogation was not so psychologically coercive that [defendant's] free will was overborne."). Thereafter, in a relatively brief and low-key interview, Defendant answered some of the agents' questions, but not others, thereby demonstrating that he

understood his rights and how to invoke them. *See United States v. Vilar*, 141 F.3d 1152, 1998 WL 105771, at *1-2 (2d Cir. Mar. 9, 1998) (rejecting argument that *Miranda* waiver was involuntary and finding accused's will was not overborne because he refused to admit that he shot a police officer despite making other incriminating statements).

Although Defendant was handcuffed during the interrogation, the agents did not physically mistreat or threaten him. *See United States v. Cardenas*, 410 F.3d 287, 295 (5th Cir. 2005) ("Such basic police procedures as restraining a suspect with handcuffs have never been held to constitute sufficient coercion to warrant suppression."); *United States v. Kon Yu-Leung*, 910 F.2d 33, 41 (2d Cir. 1990) ("[A] finding of coercion [does not] follow from the fact that [defendant] was handcuffed."). They also did not pressure Defendant to respond to their questions. To the contrary, the agents honored both Defendant's refusal to sign the waiver form and his refusal to discuss the details of the controlled buy. When Defendant decided to terminate the interview, the agents honored that request as well. There is thus no evidence of law enforcement overreaching, trickery, deceit, or coercion. *See Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (holding that "coercive police activity is a necessary predicate" to a finding of involuntariness).

Correspondingly, there is no evidence that Defendant was unusually vulnerable in the face of police interrogation. Defendant is an adult who owns a gift shop business, who has no apparent cognitive impairments, and who has had some experience with the criminal justice system, including two drug distribution convictions.[1] There is no

---

[1] Defendant suggests that his prior experience with the criminal justice system is irrelevant because he "never claimed knowledge of his rights based on [his] previous experiences." (Doc. 26 at 7-8.) However, his prior criminal experience remains relevant because it reveals that Defendant was not a neophyte confronted with a novel set of circumstances, but an individual who had some understanding of the criminal justice system and the consequences of waiving or invoking his rights. *See United States v. Morris*, 247 F.3d 1080, 1090 (10th Cir. 2001) (holding *Miranda* waiver by nineteen-year-old defendant with tenth grade education was voluntary because, among other things, his five prior arrests rendered him relatively experienced with the criminal justice system); *Spencer*, 995 F.2d at 12 (ruling that defendant's waiver of counsel was knowing and voluntary and noting that "this arrest was not his first encounter with the criminal justice system").

evidence that, during the interview, Defendant was under the influence of alcohol or narcotics or was suffering from emotional or physical distress. Instead, Defendant spoke freely with the agents about certain subject matters, while refusing to speak to them about others, thereby evincing that he understood his rights, that he retained the ability to invoke his rights when he chose to do so, and that his will was not overborne.

Based upon the totality of the circumstances, the government has established by a preponderance of the evidence that Defendant validly waived his *Miranda* rights when he chose to speak with the agents after being advised of those rights and confirming that he understood them. *See Berghuis*, 560 U.S. at 384. Defendant's motion to suppress his statements on the grounds that he did not knowingly waive his *Miranda* rights or, in the alternative, that his waiver was involuntary is DENIED.

### B.   Whether Defendant Unambiguously Invoked his Right to Remain Silent.

Defendant argues that, "by clearly communicating to [the] agents that he would not sign a waiver of his rights and would not answer questions on the events leading up to the transaction and on the transaction itself, [he] unambiguously invoked his right to remain silent." (Doc. 26 at 5.) However, in *Berghuis*, the Supreme Court "made clear that for a defendant successfully to invoke his *Miranda* rights, he must do so through a clear, unambiguous affirmative action or statement." *Plugh*, 648 F.3d at 124. "[A]bsent an unambiguous invocation, custodial officers have no obligation to stop questioning *or* to ask only questions intended at clarifying an ambiguous statement." *Id.* at 126 (citing *Berghuis*, 130 S. Ct. at 2259-60). Following *Berghuis*, the Second Circuit held in *Plugh* that "a refusal to *waive* rights, however unequivocal, is not necessarily equivalent to an unambiguous decision to *invoke* them." *Id.* at 125. Defendant correctly notes that the *Plugh* court did "not decide whether a refusal to sign a waiver-of-rights form could, itself, *ever* amount to sufficient action" to halt questioning. *Id.* at 126 (internal quotation marks omitted). Instead, *Plugh* held that "refusal . . . accompanied by statements indicating ambivalence or uncertainty" was insufficient. *Id.*

8

In this case, Defendant's refusal to sign the *Miranda* waiver form was accompanied by his contemporaneous statement that he was willing to speak to the agents. *See id.* at 125 (finding defendant did not invoke his rights by refusing to sign a *Miranda* waiver form and saying "I am not sure if I should be talking to you" and "I don't know if I need a lawyer") (internal quotation marks omitted); *Newton*, 2012 WL 170008, at *7 (holding defendant did not unequivocally invoke his right to counsel during questioning by refusing to sign a *Miranda* waiver form without counsel present). Thereafter, Defendant's refusal to discuss the controlled buy was a limited invocation of his right to remain silent, rather than an unambiguous and unequivocal request to end the interview. *See Michigan v. Mosley*, 423 U.S. 96, 103-04 (1975) (holding that the right to remain silent includes the ability to "control . . . the subjects discussed"); *Burno v. United States*, 953 A.2d 1095, 1102 (D.C. 2008) (observing that "an accused may selectively assert his right to silence" by agreeing to answer some questions and not others); *Arnold v. Runnels*, 421 F.3d 859, 864 (9th Cir. 2005) (recognizing that a defendant can invoke his right to remain silent "selectively"). Upon Defendant's limited invocation of his right to silence, the agents ceased inquiry into the circumstances of the controlled buy and focused on the location of the firearm and currency. They thus "'scrupulously honored'" Defendant's request to cut off questioning into the identified subject matter. *Mosley*, 423 U.S. at 104; *see also United States v. Mikelic*, 2011 WL 4368565, at *11 (D. Conn. Sept. 19, 2011) (finding no violation of defendant's Fifth Amendment right to counsel where defendant stated that he wanted to speak with his lawyer only with respect to certain questions, but not others, and "the officers honored [his] request").

When the agents confronted Defendant with their doubts as to the credibility of his statements regarding his path of travel and the whereabouts of the firearm and currency, Defendant unambiguously and unequivocally invoked his rights to remain silent and to counsel thereby demonstrating that had he chosen to invoke those rights at the outset of the interview, he knew how to do so. Accordingly, Defendant's refusal to sign a *Miranda* waiver form, even when considered in conjunction with his refusal to answer certain questions, was not an unambiguous and unequivocal invocation of the right to remain

silent.  Defendant's motion to suppress his statements on the ground that his right to
remain silent was violated is therefore DENIED.

**CONCLUSION**

For the reasons stated above, the court DENIES Defendant's motion to suppress
statements.  (Doc. 18.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _29th_ day of July, 2014.

Christina Reiss, Chief Judge
United States District Court